In the Matter of Proving the Last Will and Testament of
ROSA E. SPANG, Deceased.

GEORGE W. WICKERSHAM and Others, Appellants, Respond-
ents; MABEL SPANG ANCKER, Respondent, Appellant;
MARIE T. MOORE, Respondent.

First Department, May 27, 1921.

**Wills — probate — sufficiency of evidence to overcome presumption
of sanity of testator — rules for considering verdict of jury on
appeal — verdict that deceased was not of sound mind not against
weight of evidence.**

A mere scintilla of evidence is not sufficient to overcome the presumption
of the sanity of a testator, and the verdict of a jury must be considered
and its effect determined under the same rules that govern the court in
the review of the verdict of a jury in other cases where, by the Con-
stitution, or by statute, the parties have the right to a jury trial.

In determining whether the verdict of a jury in proceedings to probate a
will is against the weight of the evidence the question is whether the
finding of the jury was so far against the weight of the evidence as to
indicate passion or prejudice as the procuring cause of the verdict.

On all the evidence, *held*, that the verdict of the jury that the testator was
not of sound and disposing mind at the time the will was executed was
not against the weight of the evidence.

APPEAL by George W. Wickersham and others from a decree
of the Surrogate's Court of the county of New York, entered
in the office of said surrogate on the 15th day of April, 1920,
as resettled by a decree entered in said surrogate's office on
the 14th day of May, 1920, on the verdict of a jury adjudging
that two papers offered for probate as the last will and testa-
ment and codicil thereto of Rosa E. Spang were executed by
her at a time when she did not have testamentary capacity to
execute the same and denying probate thereof, and also from
an order entered in said surrogate's office on the 15th day of
April, 1920, denying appellants' motion to set aside the
verdict returned by the jury as to issues numbered V and
X and to set aside the general verdict in favor of the con-
testants rendered by the jury upon direction of the court and
for a new trial made upon the minutes.

Appeal by Mabel Spang Ancker from so much of said decree as orders, adjudges and decrees that the execution of the papers offered for probate herein was not caused or procured by the undue influence or fraud of any person or persons.

Pursuant to stipulation dated December 16, 1920, an order was granted by the Appellate Division on December 17, 1920, dismissing the latter appeal.

*Henry W. Taft* of counsel [*Thomas B. Gilchrist* with him on the brief; *Cadwalader, Wickersham & Taft,* attorneys], for the proponents.

*Edgar T. Brackett* of counsel [*Hiram C. Todd* with him on the brief; *Brackett, Todd, Wheat & Wait,* attorneys], for the contestant Ancker.

SMITH, J.:

Rosa E. Spang died June 22, 1919, at the age of seventy-eight years. Charles H. Spang, her husband, died February 14, 1919, at the age of eighty-five years. The property of which she died seized was mostly property that came from her husband. By her husband's will, after deducting some minor legacies, a daughter, Mabel, was given an annuity of $20,000 a year, and the widow was given the income from the balance of the property. After the death of the life annuitants the property was to be given in part for certain specific purposes named and the remainder to his executors to be distributed for charitable purposes as they might select. Under the laws of the State of Pennsylvania, of which State her husband was a resident at the time of his death, the widow had the right to elect to take under the will or to take one-half of the husband's property.* She assumed to make such an election just prior to her death to take one-half, and if that election be a valid election, the estate of Rosa E. Spang at the time of her death amounted to about $1,600,000.

By the paper sought to be proven as her will, Rosa E.

_____

* See Wills Act of 1917 (Penn. Laws of 1917, p. 410, No. 190), § 23; Intestate Act of 1917 (Penn. Laws of 1917, p. 431, No. 192), § 1.— [REP.

Spang, after giving some minor legacies and providing for the payment of inheritance taxes out of the estate, provided for the establishment of a charitable organization to be called the Rosa Spang Foundation, and gave to that corporation so to be organized the residue of her property, subject, however, to the payment to her daughter Mabel of an annuity of $10,000 for life. The charities which were to be the beneficiaries of the income under this Rosa Spang Foundation were described to be for " the relief of poverty and distress, and especially in caring for young children and babes, who by reason of orphanage, abandonment or otherwise, are without means of proper support and maintenance; in providing for the education, instruction and aid of the deserving blind; and also in affording temporary relief to unobtrusive suffering endured by industrious or worthy persons, including the bestowal or distribution of any part of such income to and among benevolent or charitable institutions, objects or persons, such as shall be deemed most useful, deserving or judicious."

Charles H. Spang and Rosa E. Spang were married in 1898. The daughter Mabel was born in 1885. There is no question raised as to the parentage of this daughter and she was accepted both before the marriage of her parents and afterwards as their child and provided for as such. The codicil to this will simply provided for a legacy to Charles C. Lockwood of $10,000 and was executed immediately after the execution of the will, and in discussing the issues in the case the will and codicil will be referred to simply as the will of Rosa E. Spang. When this paper was offered for probate, Mabel Ancker, the daughter, filed objections alleging that the will was not executed with proper formalities, that the same was procured by undue influence and that the paper was executed at a time when Rosa E. Spang was of unsound mind and without testamentary capacity to execute a will. Objections were also filed by Marie T. Moore who was a legatee under a prior will. Mabel Spang, the daughter, was first married to a man by the name of Crome and after his death was married to a man by the name of Ancker. She was in Europe at the time of the death of her father and only reached America a couple of days before her mother's death. She had had considerable difficulty in getting passports by reason

of the fact that when she went to Europe her passports were given to her under her former name of Mabel Crome, and she secured passports authorizing her return under the same name, and as she desired to return to Europe she used the name of Crome in this country and first filed the objections under that name.

Upon the trial of the issues before the jury all questions were by the court withdrawn from the consideration of the jury except the question as to the testamentary capacity of the deceased at the time of the execution of the will and of the codicil, and upon that question the jury has found that the deceased had not testamentary capacity at the time she signed the paper offered for probate as her will and codicil. From the decree entered upon this finding this appeal has been taken by the executors named in the will.

In the briefs of counsel criticism is made on the one hand of Mr. Lockwood's actions as bearing upon his interest in this case. I find nothing in the record, however, which justifies any adverse criticism. There was no effort on his part to obtain any advantage for himself or for any one else whom he represented. Mrs. Spang became suspicious of him and desired to change her attorney and he himself brought Mr. Wickersham into the case. On the other hand, Mr. Wickersham has given full recognition to any obligation which he might owe to Mr. Lockwood, and himself procured the legacy of $10,000 to Mr. Lockwood to be inserted in the codicil of the will. Criticism is made of the form of the will which gave to these executors personally any property which might fail to pass thereunder by virtue of any statutes against the passing of property under a will to charitable institutions made within certain periods before the death of the testatrix. The will as drawn contained no illegal provisions. Considerable criticism is made of the act of Dr. Chapin in excluding the daughter from her mother's room when she came there just prior to her mother's death. But this was done in accordance with the expressed wish and determination of the mother not to see her daughter, and it can well be surmised that any scene between them would have hastened her mother's death. These executors in this will were all men of standing in the community.

The only issue here argued is as to whether the finding of the jury is based upon sufficient evidence. In *Matter of Eno* (196 App. Div. 131), decided by this court April 8, 1921, the opinion of Mr. Justice PAGE states the rule which is to guide our determination of this question. It is there stated that a mere scintilla of evidence is not sufficient to overcome the presumption of the sanity of the party executing the will, and that the verdict of the jury must be considered and its effect determined under the same rules that govern the court in the review of the verdict of the jury in other cases where, by the Constitution, or by the statute, the parties have the right to a jury trial. Upon this rule of law as there declared this court was unanimous, and the only question, as we view this case, which we are called upon to determine is as to whether under this rule the verdict is against the weight of evidence. Upon that question, further, we are controlled by the uniform rulings of the courts. The question is not as to what the reviewing judge would have decided if the case had been originally before him for determination, but the question to be determined is as to whether the finding of the jury was so far against the weight of evidence as to indicate passion or prejudice as the procuring cause of the verdict. While there is evidence in the case tending to establish the mental capacity of the decedent, there is much evidence to the contrary. There is evidence in the case as to the vulgarity of the deceased and perhaps of a depraved mind tending to eroticism, but such a perversion of the mind, even if abnormal, in no way entered into the making of this will. That tendency was perhaps caused by the physical condition of the deceased. But whatever the cause may have been, it had existed for many years prior to her death, so that under the evidence of the experts for the contestants it had little, if any, significance in determining whether at the time of the execution of the paper propounded as her will she had senile dementia, which is claimed to have incapacitated her from making a will. The brutality of the deceased to her husband in his last sickness as sworn to by the witnesses for the contestants, if not exaggerated, would indicate an abnormal mind, but no such perversion of the mind has in any way entered into or influenced the making of the will in question, although it may be generally

pertinent as to the question of mental capacity to make a will. On the other hand, there is evidence of facts which are clear indications of senile dementia, which, if it existed, would have rendered her incapable of comprehending the natural claims to her bounty. To my mind one of the most significant facts which bear upon this question is her apparent vacillation in her regard for her daughter. This daughter in her younger days was sent to school and there came under the influence of a teacher who had acquired apparently an unnatural influence over her and the influence was a degrading one. To withdraw her from this influence the father and mother had her committed to a sanitarium. This was done upon the certificate of physicians according to the requirements of the statute. A habeas corpus proceeding was commenced which was tried in Brooklyn, and upon that proceeding the certificates of these physicians were produced and made public, and the daughter charged the mother as being an unnatural mother and stated publicly that her mother would lie about her and poison her if necessary to accomplish her purposes. She was finally released from the sanitarium and put in charge of another woman, with whom she was sent abroad, and she remained abroad for a number of years, and finally came home and was married to Crome, her mother and father attending the wedding. This proceeding before the court in Brooklyn caused deep resentment against the daughter on the part of the deceased, which seemed to return from time to time during the rest of her life. I say from time to time, because during this period there were times when the mother is shown to have spoken kindly of her, while towards the close of her life her picture which hung upon her mother's wall was turned face to the wall and she spoke very bitterly of her daughter. Before her husband's death she had executed a will giving her personal property to Mrs. Marie T. Moore. At the time of her husband's death Mr. Lockwood was the attorney for her husband, as well as her attorney. He called her attention to the fact that by this will all the property which she acquired from her husband which, if she elected to take under the Pennsylvania statute would amount to $1,500,000, would go to Mrs. Moore. She at first insisted that all that the will meant was that her personal belongings

should go to Mrs. Moore, but afterwards, after explanation by Mr. Lockwood, she made a new will, in which she gave all of her property, after the payment of her debts, to her daughter Mabel. The making of this will is not in itself, as I view it, so significant, because of the conceded fact that it was made as a temporary will until a further will could be more deliberately drawn. But her expressions in connection with the making of that will are significant of her sentiments towards her daughter at that time. Mr. Lockwood swears that at the time she executed this new will in February, after her husband's death, she stated that she intended to draw a new will in which the bulk of her property should go to her daughter. The witness Harvey swears that after the making of this will and within five weeks after her husband died she asked her what would become of her things if she should die, and the deceased answered, " You damn fool, who do you suppose would get them but my daughter," and further, that the deceased said to her about three weeks before her death, " ' Harvey, I am going to die,' and I said ' I wouldn't think so, Mrs. Spang; you have got plenty now; you can look after yourself and take care of yourself.' ' No,' she said, ' I am going to die, and if that Mabel would only be here,' she said, ' until this will is settled;' and I said: ' Well, now, Mrs. Spang, look here, why do you feel so badly? ' ' Because,' she said, ' I am going to die, Harvey, but when I die I will make a will, and I will leave things to my friends; I won't do like Mr. Spang done.' I said: ' You will? ' She said ' Yes; there are three I am going to remember outside of my child; that is Mrs. Keating, Mrs. Moore and Maggie Dunn.' " There is no doubt that about the time she made her will her antipathy to her daughter had returned. She had given orders that her daughter should not see her after she returned. As before stated, she had turned her daughter's picture face to the wall. The testimony shows that her gift to her daughter in the will was given by reason of the persuasion of Mr. Wickersham. The inconstancy of her feelings towards her daughter from the time of her husband's death to the time she died leaves serious doubt in the mind as to whether she was capable of appreciating the moral claims that her daughter had to her property. Moreover, she had told

Mrs. Brown that she was to leave her $25,000 in her will. After she executed the will, Mr. Lockwood swears Mrs. Brown told him that Mrs. Spang said to her that they did not draw the will in the way she wanted it. " It was a long rigmarole and I was too sick to understand it, you know I wanted to leave you $25,000 as I told you, and I am afraid they have not got that in right; you take my handbag with all the jewelry, and if I die, keep it; it will help to make up for what you have done." This Mrs. Brown denies, except that she admits that Mrs. Spang told her that she would leave her $25,000. The part of the conversation between Mrs. Brown and Lockwood as sworn to by Lockwood is not competent evidence of the facts therein stated. It is only competent, if at all, as tending to discredit the testimony of Mrs. Brown, who swore to facts tending to establish the mental capacity of the testatrix. She had said that she was going to leave money to Mrs. Keating and Mrs. Moore, but she left them nothing in her will. The testimony of Dr. Peterson, the expert, sworn in behalf of the proponents of the will, strongly tends to establish her mental capacity. On cross-examination, however, a number of instances were referred to which had been sworn to by other witnesses which Dr. Peterson himself said indicated, if true, " a lack of intelligent grasp of affairs." Her forgetfulness is an indication of a weakened mind, especially forgetfulness of an important incident occurring shortly before. She forgot that the will she had made in favor of Mrs. Moore had been destroyed and doubted if that had been done. She signed the election to take under the Pennsylvania statute which gave to her a million and a half of property, and yet, after having signed that paper she wrote to Mr. Wickersham that she had no memory of signing it and was very skeptical of the signature. Very strong corroboration of the incapacity of the deceased is found in the testimony of six physicians who had treated her at periods within the last five years of her life, all of whom swore to a large number of acts during those times that they considered irrational. Still further is the testimony of two of the experts called for the contestants, who swear, upon the hypothetical question involving facts which the jury were at liberty to believe, that at the time of the making of the will, the deceased was suffering from senile

dementia and incapable of understanding the nature of her act and its consequences.

This will was executed upon the day before the death of Rosa E. Spang. She was confessedly, at that time, in a very feeble condition. Within a few days she had had several attacks of heart trouble, which were apparently due not only to her age, but to a disease which was cancerous in its nature and which affected her whole system. Upon the night before she had had a very serious attack from which it was at times doubtful if she would recover. There is considerable evidence of her having expressed strong aversion to children, calling them little brats, and strong aversion to organized charities, and of her having expressed the belief that the moneys given for those charities never reached the persons sought to be benefited by the charities. And still the provisions of the will were in part for the benefit of children and authorized the giving of these moneys by the trustees of the Rosa Spang Foundation to charitable institutions for distribution. These provisions in the will might have been found by the jury to have indicated a change of purpose which is, at least, significant upon the mental capacity of the deceased at the time she executed the will, and the jury might have been in doubt as to whether she fully understood its provisions, by reason of her physicial condition at the time she executed it. One of the facts to be considered in sending a case back for a retrial is the probability that a different conclusion will be reached upon a subsequent trial. In my judgment, the result of a new trial would be the same as that reached by the jury in the verdict here rendered.

In this recital I have not mentioned many other incidents to which weight is given by the physicians as indicating the mental lapses of the deceased and the senile dementia. It clearly cannot be said that the verdict is without evidence to support it, nor in my judgment can it be said that the verdict indicates passion or prejudice on the part of the jury. The law has given the right to determine the facts in these cases to a jury, and we are not authorized to reverse their finding merely because we might individually have reached a different conclusion.

Without further discussion the decision which we have

reached is that upon the appeal of the executors the decree must be affirmed, with costs out of the fund to all parties presenting briefs. The appeal of the contestants is dismissed.

CLARKE, P. J., LAUGHLIN, DOWLING and GREENBAUM, JJ., concur.

Decree affirmed, with costs to all parties payable out of the estate, and appeal of contestants dismissed.