In the Matter of the Compromise of Controversies Arising between Claimants Interested in the Estate of EMILY A. WATSON, Deceased, Prior to the Probate of the Last Will and Testament of Said Deceased.

Surrogate's Court, Westchester County, December 19, 1924.

Wills — contested probate — application for approval of proposed compromise agreement prior to probate of will pursuant to Pers. Prop. Law, § 24, and Real Prop. Law, § 73 — compromise approved where settlement is just and reasonable in its effect upon estate and all parties involved.

An application for the approval of a proposed compromise agreement pursuant to section 24 of the Personal Property Law and section 73 of the Real Property Law, between the litigants pending the trial of a contested probate proceeding, will be granted, where it appears that the agreement for the settlement of the contest by the payment of about twelve per cent of the personal estate valued at $8,000,000, is just and reasonable in its effect; that the settlement will avoid great expense, tedious delay, bitter litigation and the risk, however remote, of the possible loss of the entire vast personal estate to the detriment of infant beneficiaries; and that it will work for the best practical result to the said infants and the unborn.

APPLICATION by executors for approval of proposed compromise agreement, prior to probate of will, and for appointment of special guardian.

*Frederick C. McLaughlin* and *Herbert M. Teets*, for the proponents.

*Cadwalader, Wickersham & Taft* [*Thomas B. Gilchrist* of counsel], for the next of kin, contestants.

*J. Noble Hayes* [*Howard Kingsbury* of counsel], for Pauline Andre de La Mettre, George Watson Pratt DeGasquet James and John Watson Dwight.

*Coudert Brothers* [*Howard Kingsbury* of counsel], for Countess Victoire Louise Niel.

*John H. Stephens*, for Jean B. Dwight, Lucia King Dwight and Harriet D. Bailey.

*I. Maurice Wormser*, special guardian for infants and unborn.

SLATER, S.:

This is an application by the executors designated in the propounded will which is being contested, for the approval by the court of a proposed compromise agreement between the parties, prior to the probate of the will, and for an order appointing a special guardian for infants and unborn, pursuant to section 24

of the Personal Property Law and section 73 of the Real Property Law.   The procedure followed *Matter of Bemis* (116 Misc. 516).

The court appointed Professor I. Maurice Wormser special guardian to receive service of the citation and to appear for the infants and unborn who were interested; to represent their interest in the compromise; to hear the parties and to fully examine into the matter; to advise the court in their behalf; to hear all the facts relating to the claims of the various parties to the controversy, and to report whether the proposed compromise should be approved by the court.

The matter came on for a hearing before the court, at which time the consent of all the adult beneficiaries was filed.   Testimony was taken with relation to the approval of the agreement by the adults interested.   The special guardian testified relative to the contention of the proponents and the contestants bearing upon the merits of the controversy.   At such time the special guardian filed his report in which he concluded that the agreement for settlement of the contest is just and reasonable in its effect upon the interests in said estate, or property of said infants and unborn. He advised that the compromise agreement be approved and sanctioned by the court.   The learned special guardian also filed with his report an opinion, comprehensive and all embracing.   It follows:

" I. MAURICE WORMSER, Special Guardian:

" The will of Emily A. Watson, deceased, offered herein for probate, was executed on June 7, 1915, and the codicil thereto on August 6, 1915.   At the time they purport to have been executed, Miss Watson was upwards of seventy-two years of age and in feeble health, according to the statement of her then attending family physician.   She resided alone at her residence in a somewhat outlying section of White Plains, Westchester county, New York. She seldom came in contact with her relatives, and appears to have been surrounded only by servants.

" Miss Watson died on February 1, 1924.   Senile dementia was assigned as the cause in the death certificate.   For some indefinite period prior to then she was undoubtedly incompetent to make a will.   During the last six weeks of her life she was in a stupor.   It is commonly known that senile dementia is irregularly progressive in its earlier stages, and rapidly progressive toward the end.

" Up to May 18, 1922, Miss Watson had practically the entire management and control of her very considerable business affairs, her charities and her household, and wrote and signed her own checks and paid her own bills.   She supervised the finances and

presided over the operation of several large charities, including the Orthopedic Hospital at White Plains, in which she was greatly interested and to which she gave generously.   On that date she executed two powers of attorney to Mr. Bertram H. Fancher, her financial adviser and one of her executors.   The purpose was to enable Mr. Fancher to draw checks and to manage her business affairs.   Dr. Tracy, now deceased, her attending physician at that time, gave a verified certificate that she was then competent to understand and execute them.   Subsequently thereto her business affairs were conducted by Mr. Fancher, and her household affairs by her companion and housekeeper, Mrs. Edwards.   It will be noted that we are concerned only with the question of testamentary capacity more than eight and one-half years prior to Miss Watson's demise.

" Upon her demise her relatives consisted of four first cousins (who constitute the sole next of kin) and numerous descendants of deceased first cousins, some resident in this country and others in Europe.   The four first cousin contestants, who constitute the sole next of kin and would be entitled to receive the entire personal estate and a substantial portion of the real estate if the alleged will and codicil should not be admitted to probate, are not provided for in the will and codicil.   Provision is made for a limited number of second cousins, to the practical exclusion of all other relatives.

" Despite the omission to mention the first cousins, the will is not necessarily an unnatural one, as they belong to a southern branch of the family which separated from the northern branch a number of years prior to the Civil War; the two branches, embittered as a result of the unfortunate conflict between the States, were never thereafter fully reconciled.   Contestants, however, dispute this.

"As is not surprising, a controversy has arisen between the executors and the legatees and devisees under said will and codicil on the one side, and the four first cousins, the sole next of kin of testatrix, on the other side.   The contesting first cousins deny the validity of the will and codicil on the grounds of alleged lack of testamentary capacity and undue influence.   In my judgment, there is nothing to the contention of undue influence, and I shall not, therefore, discuss it.   The contention of lack of testamentary capacity, however, is seriously advanced in good faith, and, I am satisfied, raises an arguable question.   No determination has been made with respect to these objections, and the controversy concerning the will and codicil, and the probate thereof, and the said questions in reference thereto, are still pending before this court.

" Having in mind the uncertainty of litigation and the vast amount involved, the parties above referred to are desirous of

Misc. 216]   Surrogate's Court, Westchester County, December, 1924.

entering into a proposed settlement and compromise agreement, by the terms of which, briefly stated, the four first cousins, next of kin, are to jointly receive the sum of $1,000,000 from the personal estate.

" The personal estate of Miss Watson has been appraised at approximately $12,000,000, and since her death has appreciated. The real estate has been appraised at approximately $250,000. After making all possible deductions, the minimum of the residue would be approximately $8,000,000.   As the amount of the proposed settlement is $1,000,000, there will be available, after the settlement, the sum of about $7,000,000, which will constitute the trust *res* mentioned in paragraph ' tenth ' of the will.   By the terms of the proposed settlement, the seven beneficiaries will be surrendering only $1,000,000 altogether, in order thereby to secure for themselves, certainly and positively, a trust *res* of approximately $7,000,000, securing thereby to each of them a trust fund of substantially $1,000,000 apiece.   And, furthermore, their said initial contribution will not only bring the enormous remaining *corpus* to them, but will bring with it, also, the income thereon since the date of Miss Watson's demise.

" The present proceeding is brought in order to obtain the approval and sanction of the Surrogate's Court for the proposed compromise agreement, and my concern and province as Special Guardian are to represent the interests of the infants and unborn which may be affected in any way thereby.

" Subdivision (e) of section 24 of the Personal Property Law, with which the provision of subdivision (e) of section 73 of the Real Property Law is identical, reads as follows:

" 'An agreement of compromise made in writing pursuant to this section, if found by the court to be just and reasonable in its effects upon the interests in said estate or property of infants, lunatics, persons of unsound mind, unknown persons or the future contingent interests of persons not in being, shall be valid and binding upon such interests as well as upon the interests of adult persons of sound mind.'

" These sections have been authoritatively construed in *Matter of Bemis* (116 Misc. 516). ·

" The sole question, therefore, is whether the proposed compromise is just and reasonable in its effects upon the interests of the infants and unborn persons.

" While, after a careful investigation, I believe that probably this will would ultimately be probated, and though I am inclined to the belief that the testatrix was of sound and disposing mind at the time of making the said will and was free from any undue

or improper influence, I nevertheless strongly recommend the approval by the court of the compromise agreement for the following reasons:

" The strongest reason which actuates me in approving and recommending the proposed settlement is that none of the beneficiaries (including the infants and unborn) under the will would share in the enormous personal estate which amounts to over $12,000,000, if the will were ultimately denied probate. Speaking for the infants and unborn, I am unwilling to take this risk. The contestants — the decedent's first cousins — are the sole next of kin under the statutory estate if the will falls. This is, therefore, not the ordinary case, where the proponents usually receive a substantial amount of the personalty though the will is broken, but presents a situation where no part at all thereof would be received by them in that event.

" The uncertainties of litigation are a further reason actuating me. One who has been in litigations knows that the verdict, even though one be right, is always uncertain. It has been well said: ' Nothing is more uncertain than the verdict of a jury.' Nobody can project himself into the future and tell infallibly what a jury will do; daily we hear of cases lost that should be won, and *vice versa*.

" A careful investigation of the facts forecasts that the instant case, if litigated, will present a question of fact as to the soundness of mind of testatrix at the time of making her will, which will have to be left to the jury. There is very little likelihood of establishing *as a matter of law* that the testatrix was not insane.

" The burden, in the event of litigation, will be upon the proponents to prove that the testatrix was qualified by the statute to make the will, and theirs will be the *onus* of showing testamentary capacity. (*Rollwagen* v. *Rollwagen*, 63 N. Y. 504, 517; *Dobie* v. *Armstrong*, 160 id. 584; *Matter of Kindberg*, 207 id. 220; *Matter of Schreiber*, 112 App. Div. 495; *Matter of Smith*, 180 id. 669, 674; *Matter of King*, 89 Misc. 638, 649.)

" The tests applied by the learned surrogate in *Matter of Tymeson* (114 Misc. 643) will doubtless impel and compel the court to submit the issues to the jury. The settled law gives the determination of questions of fact in such a case to a jury for their decision, and the surrogate would not be legally justified in withdrawing the question of mental capacity from their consideration if, upon a deliberate and mature consideration of the entire evidence, *pro* and *con*, reasonable men might reasonably draw different inferences. (*Matter of Case*, 214 N. Y. 199; *Tousey* v. *Hastings*, 194 id. 79; *Hagan* v. *Sone*, 174 id. 317, 323; *Matter of Strong*, 179

App. Div. 539, 547.)   As said by the Court of Appeals, in *Hagan* v. *Sone* (*supra*, at p. 323): ' The plaintiff's proof might not have satisfied the jury that the deceased was either incompetent to make a will or subjected to any undue influence, but there was enough of it to require us to hold that the jury was the branch of the court that the law required to pass upon it.   Questions of fact arising in an action to determine the validity of a will are no different in this respect from questions of fact in any other case. When evidence is given of such a character that different inferences may fairly and reasonably be drawn from it, the fact must be determined by the jury.   The good sense of the jury, when aided by proper instructions from the court, is the best  and, indeed, the only  protection that litigants ordinarily have in the determination of issues of fact, depending upon conflicting evidence, even when such issues arise in actions to determine the validity of the most important testamentary instruments.'

" Where the evidence is conflicting and  different inferences may fairly and reasonably be drawn therefrom, the issue is for the jury, therefore, and for it alone.   (*Matter of Barney*, 185 App. Div. 782; *Matter of Hurley*, 189 id. 664; *Matter of Spang*, 197 id. 310.)

" It is conceded by proponents that at least one of the testatrix's physicians will testify for contestants.   Without admitting that the testimony of this physician, if actually given, will at all change proponents' view that the testatrix was of sound mind at the time of making the will, but only assuming — and it is possible and probable — that such physician will express his honest opinion, based on months of constant attendance upon testatrix and professional watchfulness over her health, that testatrix was highly eccentric and of unsound mind at the time the will was executed, as well as immediately prior and subsequent to the date of its execution, it cannot reasonably be expected that the case can be kept from the jury.   The testimony of this physician alone, if it turns out to be as strong as contestants claim, is sufficient to take the case to the jury, in the light of common knowledge of senile dementia in its legal aspects.   (1 Schouler Wills [6th ed. 1923], § 159.)

" In a recent case (*Matter of Burnham's Will*, 201 App. Div. 621), the Second Appellate Division unanimously stated ' that, if there be more than a scintilla of evidence tending to show incompetency to make a will, and of such a character that different inferences may fairly be drawn therefrom, the case must be decided as one of fact and if the trial be before a  jury, must be left to the jury.' (Citing *Hagan* v. *Sone*, *supra*.)   And it added: ' The function of a jury is to pass upon disputed questions of fact, even in will cases.'

"Because of the evidence tending to establish mental unsoundness and the enormous amount of money involved, and because the next of kin and closest relatives have been entirely cut off, the jury might conceivably break the will.

"'Especially with certain claimants strong and unmistakable proof and confirmation are necessary in order to restrain sympathetic and susceptible triers of the facts from "doing substantial justice" in spite of the facts. The uncertainty of a verdict grows out of all of these surrounding conditions, more or less hidden and unknown, which have a most forceful bearing upon the result of the trial. Jurymen may sometimes look one side and, in effect at least, "*make a will for the decedent in the jury room*," and distribute the property as they think it ought to be distributed.' (The Problem of Proof, by Albert S. Osborn, 358.)

"'The desire of the jury to reach a result which will, according to their ideas, "do justice" between the parties is a factor of very potent force in trying will contests *as the jury is very apt to make for the testator a will they think he should have made instead of merely passing on the validity of the will he did make*.' (2 Schouler Wills [6th ed. 1923], § 802.)

"In a recent contested probate case in which the learned counsel for the contestants in this case represented the proponents of the will, an offer of compromise by the contestants therein was rejected by the proponents because they felt convinced that the evidence at their disposal would certainly result in the probate of the will. Nevertheless, a verdict was rendered in favor of the contestants and was sustained on appeal by the unanimous Appellate Division. This result indicates the grave uncertainty in a contested will proceeding where a genuine conflict of evidence of witnesses exists.

"Even if the jury should uphold the will, there is still no absolute certainty of the ultimate outcome, because numerous close and important questions of the admissibility of evidence are involved as well as complicated problems on the qualification of witnesses to testify. These might open the door for reversible errors, and, in the event of a verdict for proponents, the contestants might, on appeal, succeed in obtaining a new trial, with the possibility of a disagreement or even of a favorable result for them in that event.

"A further reason is 'the law's delay.' Mr. Chief Justice TAFT has well stated the shocking consequences incidental to the slow-moving machinery of our American system of judicial administration. (N. Y. L. J., editorial, Nov. 13, 1924.) It is doubtless the best that can be devised, but it moves at a leisurely pace. This is an important factor herein, for, as President Coolidge truly says in his recent message to Congress: 'Justice long delayed is justice

refused.'   Should the contests long continue — as in one recent case for eight years — they would tie up the estate almost indefinitely. That possibility is a serious matter of concern not only to the infants, but to the proponents, most of whom are middle-aged and in somewhat straitened circumstances.   The American sage was right when he said: ' A bird in the hand is worth two in the bush; ' in legal contests this adage might well be paraphrased to read: ' A fair immediate settlement is better than an excellent protracted law suit.'

" A further reason is the expense and waste consequent to the continuance of the contests.   This would result not only in loss to the proponents, but to the infants and to the issue hereafter born.   In view of the size of the estate and the magnitude of the interests involved, the great expense of trials and of appeals, of attorneys and of counsel, of fancy ' experts ' and super-experts, the numerous disbursements, the printing charges, the thousand and one other inevitable costly items which eat into an estate when it is litigated — all these constitute considerations which imperatively tell one's common sense that there should, if possible, be a settlement.   If this consideration of expense seems far-fetched and extreme, let me remind the court that we have before us almost daily in the lay press the spectacle of the litigated Gould estate, wherein the litigants are spending the money of the late Jay Gould more quickly than even he could earn it.   The Watson estate should not be a replica.   The expense of protracted litigation herein might eventually equal or even exceed the amount to be paid on the proposed agreement of compromise.

" Another reason is the very large amount of money involved. In round numbers, the amount of the personal estate is $12,000,000 gross.   After payment of taxes and expenses, and of all the specific legacies contained in the first nine paragraphs of the will, the net personal estate will amount to approximately $8,000,000.   As the amount of the proposed settlement with the first cousin contestants is $1,000,000, there will remain about $7,000,000, if not more, which will be available, under the terms of the will, for the trusts in favor of the proponents, in which the infants whom I represent are interested.   Were the estate smaller, this argument might possibly be less persuasive, but considering the magnitude of the interests involved, common sense mandatorily dictates an adjustment.

" Another reason is the experience and skill in contested probate proceedings of the learned counsel for the contestants.   This pragmatic consideration must not be minimized.   Discretion is oftentimes the better part of valor, and I do not feel that the proponents are running away from the scene of conflict in joining

in a settlement which gives the contestants one dollar out of every eight dollars — contestants being more closely related to the testatrix than the proponents and the infants, and proponents and the infants standing to lose *all* in the event of their defeat.

" Another reason is that the contestants have a considerable number of reputable witnesses, including the former chief family physician of testatrix, who will testify to many and varied peculiar and eccentric actions on the part of the testatrix. Miss Watson's regular physician, who was in attendance upon her at the time the alleged will and codicil were executed, has given his opinion to counsel for the contestants that the decedent was not of sound mind at that time, and has stated to them that he would so testify upon the trial of the probate proceeding, and has furnished information as to physical and mental symptoms and circumstances within his recollection which support his conclusion. Another physician, who attended the decedent at a later date, has stated to contestants' counsel that he is prepared to testify that, in his opinion, the decedent was of unsound mind at the time he attended her. Several of the old family servants, as well as a number of trades-people, will testify to similar effect. As they were in daily contact with the testatrix, the testimony narrated by them, even though possibly untrue, would doubtless impress the jury. As I am satisfied that the contestants have sufficient evidence to carry the case to the jury, why should the infants be placed at their dubious mercy, in view of the familiar present day tendency of juries to set aside wills which fail to provide for the decedent's nearest relatives? The Appellate Division has told us (*Matter of Spang*, 197 App. Div. 310) that the law gives the jury the right to determine the facts and that the surrogate or appellate court is not authorized to disturb the jury's finding merely because it might reach a different conclusion.

" Another reason is that the proponents recently have lost, through death or other mishap, several of their most important witnesses, which directly affects the prospects of ultimate success of the infants. Lures and nets, perchance even wanton wiles, are sometimes resorted to, 'tis said, and while all the counsel concerned are acting according to the highest standards of professional ethics — yet there may be others to the litigation whose ambitions or desires might warp their better judgment — and so common sense and experience again tell us that the infants and unborn should not be permitted to run these risks. Why not avoid Scylla, if possible? Only very recently a local doctor who attended testatrix for several years and would have testified that she was sane and of sound and disposing mind, has died. Another witness has

Misc. 216]   Surrogate's Court, Westchester County, December, 1924.

become paralyzed and is not now even in a condition such that her deposition can be taken. The subscribing witnesses themselves are no longer youthful, and there exists no legal method whereby their testimony can be perpetuated in form such that it can be used at a trial. One of the most important family servants, who was expected to testify for the proponents and executors, recently has gone over, bag and baggage, to the contestants — despite a prior sweeping sworn statement that his employer was sane. Other witnesses might conceivably follow suit. When we bear in mind that there may be two or more trials of this case, as in the comparatively recent *Eno* litigation — for the ability of the contestants to protract the litigation through the appellate courts is almost a certainty — how can the foregoing circumstances be ignored by any one who does not allow his judgment to be overcome by a too exuberant enthusiasm? How could one possibly ' guarantee ' to the infant beneficiaries that the ultimate decision would be in favor of the will?

" Another reason is that, since the death of decedent, the estate has greatly appreciated. The recent rise in the value of bonds and high-grade stocks since the date of the recent national election is reflected in the principal. The amount payable to contestants is largely met from ' unearned increment,' and is not taken from the mouths of others. The increase in the value of securities since Miss Watson's demise will, *per se*, almost meet the amount of the $1,000,000 settlement.

" Another reason is that the parties primarily interested, including the first cousin contestants and the proponents, are desirous to make this settlement. This is true of their respective counsel as well, all of whom fear that otherwise the case will be in the courts for many years.

" From my standpoint as the guardian of the interests of the infants and the unborn, the fact that the *entire* amount of the enormous personal estate is in complete jeopardy is the most significant factor bearing upon the desirability, prudence and expediency of the proposed settlement. Having fully in mind the dangers and chances of the litigation (Cardozo, Nature of the Judicial Process, pp. 149–152), and assuming even that there is the strongest chance of ultimately upholding decedent's will, nevertheless no prudent lawyer would care to assume the onerous responsibility of refusing peremptorily a compromise of a litigation, which sets at stake the entire personal estate, by the payment of a sum equal merely to about twelve per centum thereof.

" Is it not surely worth while from every practical standpoint

15

to forego one dollar out of eight dollars in order to obtain a respite from uncertainty, a surcease from litigation, a guaranty against delay, and an assurance of a prompt division of the estate pursuant to the will of the testatrix? Who among us would not recommend a settlement upon these terms for the sake of avoiding the great expense and tedious delay of protracted, bitter litigation and the risk, however remote perhaps, of the possible loss of the entire vast personal estate?

" For these reasons, and for the further and vital reason that my sole interest is to obtain the best practical result for the infants and the unborn, I recommend that the compromise agreement be approved and sanctioned by the surrogate, and I have, on behalf of the infants whom I represent as special guardian, as well as on behalf of the issue hereafter born, signed and executed it."

The opinion of the erudite special guardian is illuminating and satisfying. It is sound. He recites the essence of the controversy. The analysis is complete. He realized the impending jeopardy of his wards' interests. The court adopts it.

The report and the opinion of the special guardian state the reasons for the compromise agreement so plainly, so cogently, so convincingly, that even one who runs may discern the wisdom of the execution of the agreement. Conversant with all the facts, the court is of the opinion that the agreement is eminently wise. The compromise agreement is approved and confirmed.

Submit decree permitting the execution of the compromise agreement by the special guardian on behalf of infants and unborn, and confirming the agreements.