(89 Misc. Rep. 638)

## In re KING'S WILL.

(Surrogate's Court, Bronx County. March, 1915.)

1. WILLS ⬅️52—DEATHBED WILL—PROBATE—PRESUMPTION.
   While the fact that a will was made by testatrix on her deathbed does not create a presumption of invalidity, it should make the surrogate more careful in scrutinizing the document than if it was executed by a person in good health, attending to the normal duties of everyday life.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. ⬅️52.]

2. WILLS ⬅️302—EXECUTION—PRESENCE OF ATTESTING WITNESSES—SUBSEQUENT ACKNOWLEDGMENT—COMPLIANCE WITH STATUTE—SUFFICIENCY OF EVIDENCE.
   Evidence that testatrix subsequently acknowledged her signature to each of the attesting witnesses, together with evidence of the making of the signature, sustained a finding that the formalities of the statute relative to attestation by witnesses was complied with, though it appeared that the instrument was not signed by testatrix in the presence of both witnesses.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 575, 581, 700–710; Dec. Dig. ⬅️302.]

3. WITNESSES ⬅️222—PRIVILEGED COMMUNICATIONS—ATTORNEY AND CLIENT —EXISTENCE OF RELATION—PROOF.
   Evidence that an attorney, at proponent's request, went to a hospital with her to prepare decedent's will, and, on being convinced from a con-

versation with decedent that she was irrational, refused to draw the will, did not show the existence of the relation of attorney and client between him and decedent, so as to render his testimony as to such conversation inadmissible, under Code Civ. Proc. § 835, barring privileged communications between attorney and client.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 786; Dec. Dig. ☞222.]

4. WITNESSES ☞206—PRIVILEGED COMMUNICATIONS—ATTORNEY AND CLIENT.

Communications made by decedent to an attorney were not privileged, under Code Civ. Proc. § 835, even though the relationship of attorney and client existed between them, where they were made in the presence of a third person.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 761, 764, 765; Dec. Dig. ☞206.]

5. WILLS ☞55—EXECUTION—TESTAMENTARY CAPACITY—SUFFICIENCY OF EVIDENCE.

Evidence *held* to show that, at the time of the execution of the will offered for probate, testatrix did not possess testamentary capacity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. ☞55.]

6. WILLS ☞288—PROBATE—BURDEN OF PROOF.

Before a propounded document can be admitted to probate as a last will, it must be shown to the satisfaction of the surrogate, not only that the formalities prescribed by Decedent Estate Law (Consol. Laws, c. 13) § 21, were complied with in its execution, but that testatrix was free from the disqualifications set forth in section 10 as to realty, and possessed the qualifications prescribed by section 15 as to personalty, including that of being of sound mind.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 651, 652, 662, 664; Dec. Dig. ☞288.]

Proceedings on the probate of the will of Amelia King, deceased. Probate denied.

Anthony J. Romagna, of New York City, for petitioner.

William L. Allen, of New York City, for contestant.

Charles A. Furthman, of New York City, for Casper Stocker and others.

Frost, Daring & Warner, of Albany, for Eliza Laible.

Anthony J. Griffin, of New York City, special guardian, for unknown infants and incompetents, if any.

Ely Neumann, of New York City, special guardian, for Lilie Schrauf.

SCHULZ, S. The alleged will of the decedent is offered for probate by her niece, who is nominated and appointed therein as executrix thereof. The proponent, under the terms of the propounded document, if established as the valid will of the decedent, would receive the sum of $7,500. The instrument also contains a provision in favor of a daughter of the decedent in the sum of $2,000, and then a bequest and devise of the rest, residue, and remainder of her property to certain of her nephews and nieces named therein. It is conceded upon the record that the property of the decedent, real and personal, is of the value of about $12,150, so that the proponent is the largest beneficiary.

In her petition for probate she sets forth as all of the heirs and next of kin of the deceased the daughter of the deceased named in the will, if she be living, and, if she be dead, her personal representatives, etc., and also the nephews and nieces who are mentioned as residuary legatees in the will. No reference is made to the sister of the decedent, although it is claimed that at the time the alleged will was executed by her she mentioned her sister. The daughter was served by publication, and upon affidavits submitted by the petitioner, which tended to show reasonable effort to ascertain the residence of the daughter of the decedent and a failure to find it, mailing of the citation was dispensed with.

Pending the submission of proofs, the sister of the decedent applied for an order bringing her into the proceeding as a party and allowing her to appear. Such order was made, and she thereupon appeared and filed objections in the usual form. All of the adult nephews and nieces mentioned in the will joined in filing objections, in which they raised the usual issues and also specifically averred that at the time the said document purports to have been signed by the decedent she was in a dying condition and unable and incompetent to make a will; that the same was procured from her by undue influence exercised over her by the proponent, or some other person who caused to be inserted therein a bequest to the said proponent of $7,500, and that the said decedent was unable to comprehend the purport of the same. The infant niece, through her special guardian, also filed objections of substantially the same tenor. Subsequently, all of these objections were withdrawn, and thereupon the testimony was taken as upon an uncontested will.

Pending the admission of the will to probate, the daughter, who had been served by publication, applied to the court for an order reopening the proceeding and permitting her to come in and file such objections to the probate of the instrument as she might be advised. This application was granted, and the daughter thereupon filed objections to the will. Upon the hearing the testimony which had been theretofore taken was by stipulation read into the record on the contested proceeding.

[1] The decedent was about 62 years of age. On or about December 4, 1913, she received serious burns which had been termed by the medical witnesses third degree burns, and by one physician as third and fourth degree burns. On January 8, 1914, she became an inmate of the City Hospital on Blackwell's Island, having come to that hospital from Lebanon Hospital. She remained in the City Hospital from that date to February 9th, when she died. The disputed document is alleged to have been executed by her at the hospital on the 5th day of February, 1914, four days before her death, and at a time when the evidence clearly shows that she was in a critical condition, seriously ill, with the chances of her recovery exceedingly doubtful. The will therefore comes within the category of so-called deathbed wills, and while the fact that a will is made at a time when the alleged testatrix is upon her deathbed does not of itself create a presumption of invalidity (Matter of Seagrist, 1 App. Div. 615, 620, 37 N. Y. Supp. 496), it should make the surrogate more careful in scrutinizing the

document than if it was executed by a person in full possession of bodily health, attending to the normal duties of everyday life.. This I believe is generally recognized by the courts. Matter of McGraw, 9 App. Div. 372, 380, 41 N. Y. Supp. 481; Rollwagen v. Rollwagen, 63 N. Y. 504, 518.

[2] The physical appearance of the propounded document is such as to warrant the most careful consideration. The name of the niece who is most abundantly provided for in, who is the executrix nominated by, and who the testimony shows was present at the execution of, the will, is Amelia Cook. The propounded document is signed "Amelia," being the first name of the decedent and also of this legatee, and then appear the letters "C-o" over which are written the letters "K-i-n-g," the letters "K-i" of the name "K-i-n-g" being superimposed upon the letters "C-o." No explanation of this unusual circumstance is offered, unless it be in the testimony of the attorney who attended at the execution of the alleged will, hereinafter referred to.

The two attesting witnesses to the document were nurses in the employ of the City Hospital, and it is claimed that the instrument was executed before them, and also in the presence of the proponent and the lawyer who prepared the document. Upon the direct examination, one of these nurses testified positively that she saw the testatrix sign the instrument; that the decedent spoke in German a great deal, and the proponent interpreted to the attorney preparing the will; that the witness at the time of the execution recalled the instructions that were given, because she understood German, but could not remember any of them when testifying. Being recalled at the same hearing, she modified her testimony by stating that she was looking at the decedent part of the time while the latter was writing her name, but that her attention was attracted to other things in the meantime, and that the paper was read aloud to the decedent and to her before the decedent and the witness signed. At a subsequent hearing she stated that she left the bedside when the decedent began to write, and that when she came back the proponent asked her to get another witness, which she did; that the attorney then pointed to the signature, and asked the decedent whether it was her signature; that he also asked her whether it was her last will and testament, and whether she was willing to have the witnesses sign as witnesses, and that she responded in the affirmative; that she is sure she did not see decedent write; that she could not see what she was writing; that she saw her arm moving. This nurse was assigned to the ward in which the decedent was confined. The other nurse was in an adjoining room and was called in by the first-mentioned nurse.

The second nurse states that she did not see the decedent sign the instrument; that she was not in the room when the instructions were given; that she did not hear the will read; that the decedent did not say anything about her signature, and that she did not remember her acknowledging her signature, or saying, "This is my signature;" and that in answer to the questions whether she was satisfied with all that was in the will, and whether she was willing to have the witness and the other nurse sign, the decedent said "Yes." At a subse-

quent hearing the witness testified that the attorney pointed to the signature of the decedent, and asked the decedent if it was her signature, and that the latter answered in the affirmative.

The attorney who prepared the will and was present at its execution also testified without objection. He says that the signature was acknowledged in the presence of both witnesses, and in his testimony is found a possible explanation for the unusual appearance of the subscription to the alleged will. He testifies that the decedent started to sign, and became weak, and that then he suggested that the proponent help her. Being recalled subsequently, his testimony was to the effect that the decedent said that she was sick, and asked the proponent to help her.

The testimony of the two attesting witnesses above referred to seems to be contradicted by the attestation clause. This attestation clause is not in printed form, but is written in longhand, and it recites, among other things, that the document was "then and there signed by Amelia King in the presence of us," and is signed by the two attesting witnesses.

I think it is clear from the testimony of the witnesses referred to that the propounded document was not signed by the testatrix in the presence of both of the witnesses. If, therefore, the statute was complied with at all, it was complied with by the decedent acknowledging the subscription to the will to have been made by her to each of the attesting witnesses. The unusual appearance of the subscription would naturally lead to the inquiry whether the signature was due to the assistance of the proponent or to her control. Matter of Kearney, 69 App. Div. 481, 74 N. Y. Supp. 1045. I think, however, that the subsequent acknowledgment of the signature, and the adoption thereby of the same by the decedent, together with the evidence as to the making of the signature, is sufficient to justify a finding that the formalities of the statute have in that regard been complied with. Knapp v. Reilly, 3 Dem. 427, 431; Van Hanswyck v. Wiese, 44 Barb. 494; Robins v. Coryell, 27 Barb. 556; Chaffee v. Baptist Missionary Society, 10 Paige, 85, 92, 40 Am. Dec. 225; Sisters of Charity v. Kelly, 67 N. Y. 409. I should hesitate to base a finding that such an acknowledgment was made upon the testimony given by the two nurses standing alone, and which they gave after they both testified on the first hearing, upon which occasion they did not testify to such acknowledgment; but I find in the testimony of the attorney who prepared the will, when he first testified in the proceeding, a statement to the effect that such acknowledgment was made. With his testimony corroborating the testimony of the nurses before me, I reach the conclusion that the formalities of execution were complied with, assuming that the decedent was competent to comply with them.

[3-5] I pass, therefore, to a consideration of the testimony bearing upon the mental condition of the decedent and the influences surrounding her at the time of the alleged execution of the document. The testimony of the subscribing witnesses and the attorney who prepared the will has already been referred to, and is to the effect that the decedent was rational. Among the witnesses produced by the contestant were three who had seen the decedent on the day the will was exe-

cuted. One of these witnesses was an attorney at law favorably known throughout this county, who appeared to be entirely disinterested, and whose testimony has not been contradicted or impeached in any way. He testifies that on the 4th day of February, 1914, the day before the alleged will was made, the proponent called upon him, and that he then made an appointment with her to attend at the City Hospital on Blackwell's Island on the following day for the purpose of preparing the last will and testament of this decedent; that on the following day, at about noon, he attended at the bedside of the decedent in company with the proponent; that the decedent was lying in a single bed; that the color of her skin was grayish, her teeth clenched, and her lips drawn tightly over her teeth, and when he spoke to her he could hardly get an answer that was audible; that she uttered sounds which came at distinct intervals of time after a minute or two, and that he was present about 20 to 25 minutes; that he asked her the names of relatives, and got no answer to the question, but that she answered "Yes," at some times, and at other times "No," when the proponent put questions to her suggesting names; that he asked her whether she wanted him to draw her will, and after some hesitation she said, "Yes," and upon again asking her she replied in the German language "Morgen," meaning tomorrow; and that her acts and declarations as testified to by him impressed him as being irrational. He further says that he then told the proponent that he would not draw the decedent's will, and did not think that she was capable of executing a will; that he called upon the house surgeon, and conferred with him, the conversation itself being excluded on objection; and that he then left without drawing the will, in company with the proponent.

Most of the testimony of this witness was taken over objections made thereto by the proponent, or some of the legatees, or both, on the ground, among others, that it involved communications between an attorney and his client, and was thus barred by the provisions of section 835 of the Code of Civil Procedure. My opinion is that his testimony did not involve such communications, for the reason that the relationship of attorney and client was not established, and, even if established, the communications were not privileged, because made in the presence of a third person, namely, the proponent. Baumann v. Steingester, 213 N. Y. 328, 107 N. E. 578, and cases cited.

The attorney who drew the will states that he did not know the proponent, but that a telephone message was received at his office on February 5th before 3 o'clock p. m., making an appointment for him with her, and that she arrived at his office at 3:30, his office being in New York City, and that he thereupon went with her, and arrived at the ward where the decedent lay ill at about 10 minutes to 4 p. m. His testimony further is that the proponent did not inform him that she had been at the hospital with another lawyer, and that when he entered the hospital he told the persons at the office that he desired to draw a will, but not whose will he desired to draw. The proponent was not called to contradict this testimony, and the court must therefore accept as proved that the proponent, after having attended with an attorney to draw this decedent's will, and having been advised by the at-

torney, after he had asked questions of the decedent, that in his (the attorney's) opinion the decedent was not capable of making a will, she hastened from the hospital and sought another lawyer to prepare the decedent's will, whom she did not advise in any way of what had occurred, so that the latter might have conferred with the house physician in charge and taken more precautions, as he undoubtedly would have done had he known the facts, to establish that the decedent was competent to execute the instrument. It does not follow that, because these occurrences took place, the decedent was of unsound mind at the time she executed the will; but they throw a light upon the method employed by the proponent to bring about the preparation of this will, which I think was, to say the least, indiscreet.

The house physician, in charge of the institution in which the patient was confined, was also called by the contestant, and his testimony is that he saw her probably every day; that on the 29th of January she had a chill and developed bronchopneumonia, and on February 4th her condition was such that when spoken to she had to be aroused, and her answer was "Yes" and "No" for the same question; that when spoken to there was no response; and that she was ordered to be put on a waterbed, and was put on a waterbed at 9:30 a. m. on February 5th to prevent her injuring herself. He further says that at 1:30 o'clock on February 5th, which it will be observed was only a few hours prior to the time when this alleged will was made, and between the time the first attorney had declined to prepare the alleged will and its subsequent preparation, he made a thorough examination of the deceased and made the diagnosis of pneumonia; that she had to be aroused; that there was no response, only muttering, and no reply to questions put to her; that she could not answer, and was in a stupor; and that she was not in such a mental state that she could recall the objects of her bounty or the nature and extent of her property.

The testimony of the physician in immediate charge of the ward where the deceased was confined was not directed specifically to the mental condition of the patient, but rather explanatory of the bedside notes and charts and her general condition. Among the other witnesses called were two physicians who testified as experts, one for the proponent and the other for the contestant. Neither of these gentlemen had ever seen the decedent, and their answers were based entirely upon hypothetical questions founded upon the hospital record that was in evidence. The testimony of the witness for the contestant is that in his opinion, based upon the hospital records, the decedent became mentally incapable of making a testamentary disposition of her property on February 2, 1914; and the testimony of the witness for the proponent is that he could not tell the mental condition of the deceased from the hospital record upon any particular day prior to the time the record states the patient became delirious, which was the day after the alleged will was made. Both physicians agree that the best method of determining the mental condition of a person at a given time is by personal observation. I consider the testimony of the witnesses who actually saw this decedent upon the day when the will was execut-

ed of the greatest importance, and have for that reason referred to it at some length. It is unnecessary to analyze the voluminous testimony of the other witnesses.

There is no evidence to indicate why the decedent should prefer her niece, the proponent, over her own daughter. There is testimony by the attorney who prepared the will to the effect that the proponent herself made some reference to services she had rendered for the decedent; but this is clearly a self-serving declaration made by an interested party, which the court would have stricken out if requested so to do, and to which very little, if any, weight can be given. The same witness also testifies to a statement made by the decedent herself, to the effect that the proponent had taken care of her. This is so vague and indefinite, however, that it is difficult to base any finding upon it. If the proponent did render services to the decedent for many years, and did take care of her, it seems to me that more convincing proof of such facts might have been produced. An old friend and neighbor of the decedent was upon the stand. She had known her for over 30 years; but she does not testify to such facts, and, indeed, was not examined as to them.

It is contended that the daughter did not often visit her mother, and from this is argued that the relationship between the decedent and her daughter was not pleasant; but I think that the reason for the absence of the daughter from the mother's home has been explained. It is not necessary to refer to it at length in this opinion. Suffice it to say that there appears to have been a reason which to the decedent seemed sufficient why the decedent did not wish to have her daughter call upon her frequently and kept her more or less at a distance. Under the circumstances, I do not think that this state of facts was an indication that the affection which this mother had for her daughter was less strong than that which usually exists between persons so closely related, and it certainly was no reflection upon the daughter. If anything, the facts disclosed would warrant the assumption that the affection of the decedent for her daughter was strong. As late as October, 1913, she wrote to her in endearing terms, as appears from writings in evidence.

[6] The burden of proving that the propounded document is the valid last will and testament of the decedent, upon the factum and the issue of testamentary capacity, is upon the proponent. Before a will is admitted to probate, the evidence should be of such a nature and of such weight and probative force that the court on its conscience can say that the document is what it purports to be; not alone that the statutory formalities of execution were compiled with, but that the decedent had testamentary capacity. Code Civ. Proc. § 2614, formerly Code Civ. Proc. §§ 2622, 2623; Matter of Goodwin, 95 App. Div. 183, 88 N. Y. Supp. 734; Matter of Schreiber, 112 App. Div. 495, 98 N. Y. Supp. 483; Matter of Lissauer, 5 N. Y. Supp. 260; Matter of Gedney, 142 N. Y. Supp. 157; Rollwagen v. Rollwagen, 63 N. Y. 504; Matter of Cottrell, 95 N. Y. 329, 336; Matter of Martin, 98 N. Y. 193, 196. I am aware of the decision in Matter of Kindberg, 207 N. Y. 220, 100 N. E. 789, to the effect that:

"Undue influence is an affirmative assault on the validity of a will, and the burden of proof does not shift, but remains on the party who asserts its existence."

But I do not read that opinion to establish the principle that the same is true of the issue of testamentary capacity. Section 21 of the Decedent Estate Law, being Laws of 1909, chapter 18, and constituting chapter 13 of the Consolidated Laws, sets forth the statutory formalities that must be observed in the execution of a will; but, even if these formalities are observed, the executed document is not a will, valid to pass real and personal property, unless it is executed by *one who may devise real estate and bequeath personal property.* Section 10 of the Decedent Estate Law provides:

"All persons, except idiots, *persons of unsound mind* and infants, may devise their real estate, by a last will and testament, duly executed, according to the provisions of this article."

And section 15 of the Decedent Estate Law provides:

"Every male person of the age of eighteen years or upwards, and every female of the age of sixteen years or upwards, *of sound mind and memory, and no others,* may give and bequeath his or her personal estate, by will in writing."

The statute thus makes a condition precedent to the execution of a will that the testatrix be of sound mind, and hence the burden of proving that fact is upon the proponent, just as it is incumbent on her to prove the formal steps taken in the execution of the instrument. This, I think, constitutes an important distinction between the issue of undue influence and that of testamentary capacity.

In the case now before me the evidence does not convince me that this testatrix was of sound mind on February 5, 1914. On the contrary, even if the burden of proof were upon the contestant on that issue, I would, on the evidence, hold that she had sustained that burden. I am therefore of the opinion that at the time this alleged will was executed the testatrix was not possessed of testamentary capacity, and that the will for that reason should not be admitted to probate as her valid last will and testament.

Had I reached a contrary conclusion, however, I would still hesitate to permit this document to go to probate. A consideration of the conditions under which this will was executed; the physical condition of the decedent, practically undisputed; the fact that the chief beneficiary was advised by the first attorney, whom she requested to draw the will, that in his opinion the testatrix was incompetent; her haste in procuring another attorney, when the last statement made by the decedent to the first attorney was that she would make her will the next day; her failure to advise him of what had occurred a few hours before; the fact that it was her hand which guided, if it did not control, the hand of the decedent when her name was subscribed to the instrument, under the terms of which the decedent's only child would receive but $2,000, whereas the proponent would receive $7,500, and the remaining nephews and nieces almost $2,700—all of these facts would cause me grave doubt as to whether the propounded document was the expres-

sion of the free desire and will of the decedent, or was due to an influence exerted upon her, which in her weakened condition supplanted her will with the will of another and constituted undue influence. Marx v. McGlynn, 88 N. Y. 358, 371; Children's Aid Society v. Loveridge, 70 N. Y. 387, 394, and cases cited supra.

A further consideration of this question, however, is not necessary, in view of the conclusion which I have reached upon the issue of testamentary capacity. In accordance with the views expressed, it follows that probate of the propounded document must be denied.

Probate denied.