In the Matter of the Estate of MEYER CHINSKY, Deceased.*

Surrogate's Court, Kings County, April 9, 1934.

*See, also, 150 Misc. 274.

*Sherman & Goldring* [*Carl Sherman* of counsel], for the proponent.
*Adolph Feldblum* [*Aaron W. Levy* of counsel], for the contestants.
*Abraham J. Herrick*, for the Israel Zion Hospital.
*Moos, Nathan, Imbrey & Levine*, for Sol Insky.

WINGATE, S. The will which is the subject of the present contested probate proceeding purports to dispose of the estate of a publisher of Hebrew books, and his business in this connection is the main asset of the estate.

Whereas the contestants interposed the usual omnibus broadside of objections, the only question remaining for decision at the close of the trial relates to the testamentary capacity of the testator, with the related issue as to whether the contents of the propounded instrument represented the conscious testamentary act of the testator; in other words, whether at the time of its alleged execution he knew and understood its provisions.

It was a deathbed instrument and, according to the testimony of the subscribing witnesses, who were all attaches of the hospital which, under the terms of the will, is to receive approximately sixty per cent of the estate, was executed less than three hours prior to the moment of death; how much less is a point on which the record is unsatisfactory in the extreme.

Concerning such an instrument, the late Surrogate SCHULTZ remarked in *Matter of King* (89 Misc. 638, 640, 641): " While the fact that a will is made at a time when the alleged testatrix is upon her death-bed does not of itself create a presumption of invalidity * * *, it should make the surrogate more careful in scrutinizing the document than if it was executed by a person in full possession of bodily health, attending to the normal duties of every-day life."

The terms of the instrument are quite unusual. After directions for payment of debts and funeral expenses, the document purports to give legacies of $50 to each first cousin, and of $500 to each nephew of the decedent " after they will present to my hereinunder named executor legal proof " of their relationships as such. Aside from a gift of $300 to a named congregation and certain inconsequential

bequests for prayers for the dead and care of burial plot, the entire remainder of the estate is given to the unrelated proponent-executor, who is directed to continue decedent's publishing business and to pay, annually, sixty per cent of its profits to the hospital where decedent died, " and the remaining forty per cent (40%) to be distributed by my executor as he in his sole judgment may deem best to institutions located in New York and in Jerusalem, Palestine."

The executor is given extremely broad powers of disposal of the assets of the estate and for conduct of the business, and is vested with a discretionary authority to name two additional executors. The furnishing of security by him is waived.

The genesis of this instrument is interesting. On the morning of April sixth the decedent, according to the testimony of certain of the hospital attaches, expressed to the proponent a desire to make a will, and the latter made certain notes. On the evening of the same day, which was that of the night on which decedent died, the proponent visited an attorney by the name of Ribman, who at the executor's solicitation dictated to the daughter of the executor the general contents of the instrument, which she took down in shorthand. As so dictated, the name of the executor and the names of beneficiaries were omitted, the executor stating to Ribman that he had received no instructions from the prospective testator on these subjects. The instrument in completed form was brought by the executor to the hospital for execution on the same night, but he had not seen or received any communication from the testator in the interval.

Under such circumstances, where the draftsman of the will is to obtain absolute and, in the first instance at least, wholly uncontrolled possession of substantially the entire estate, ultimate ownership of forty per cent of which is to go to his nominees and of sixty per cent, to the institution upon the testimony of whose employees he must place reliance for sustaining the validity of the instrument, it is incumbent upon the trier of the facts to see to it that the prerequisites to the validity of the will are clearly and satisfactorily established. Whereas the familiar principle of law that a burden of explanation is imposed upon a draftsman who derives a benefit under the will (*Matter of Smith*, 95 N. Y. 516, 522, 523; *Matter of Putnam*, 257 id. 140, 143) does not technically apply in the case at bar, since the present issue is not one of undue influence, but of testamentary capacity, the fact remains that here, as in such a case, " the law is not so impracticable [*sic* impractical?] as to refuse to take notice of the influence of greed and selfishness upon human conduct, and _ * * * it wisely interposes by adjusting the

quality and measure of proof to the circumstances, to protect the weaker party." (*Matter of Smith, supra,* p. 523.) (See, also, *Matter of Jones,* 199 App. Div. 426, 431, 432.)

On the issue of testamentary capacity and understanding of the will by the testator, the burden of proof is upon the proponent (*Delafield* v. *Parish,* 25 N. Y. 9, 34; *Matter of Kellum,* 52 id. 517, 519; *Howland* v. *Taylor,* 53 id. 627, 628; *Rollwagen* v. *Rollwagen,* 63 id. 504, 517–519; *Matter of Martin,* 98 id. 193, 196; *Matter of Schillinger,* 256 id. 186, 188; *Weir* v. *Fitzgerald,* 2 Bradf. 42, 68, 69; *Matter of Bedell,* 107 App. Div. 284, 286; *Matter of Regan,* 206 id. 403, 408; *Matter of Mullin,* 143 Misc. 256, 259), and since, in the case at bar, the witnesses to the document, by reason of their employment by a party directly interested in the result, " may have such an interest in the question at issue as to affect their credibility," such relationship to the subject-matter in controversy is sufficient to require their credibility to be submitted to the decision of the trier of the facts, particularly " where from the circumstances of the case the testimony of the witness is not susceptible of direct contradiction." (*Matter of Kindberg,* 207 N. Y. 220, 227.)

With these preliminary observations, the salient facts as developed at the trial will be reviewed. The decedent was taken from his home to the hospital by means of a stretcher and an ambulance on the afternoon of April 4, 1933. The physician who had treated him for fifteen years testified that he was suffering from diabetes and Bright's disease and that he knew he could not survive and needed better care than was obtainable at his home. At the hospital he was admitted as a pneumonia patient, but it was later decided that he was suffering from an advanced case of pulmonary tuberculosis. A physician who was a specialist in tuberculosis testified that the hospital records indicated that the patient also had acute bronchial pneumonia and a widespread infection of the lung bed. At the time of his admission to the hospital his temperature chart shows a fever of 103 3/5 degrees, while during the twelve-hour period preceding the death it was at no time below 103, and at or about the time it is claimed the will was executed it was above 104.

According to the testimony of the night nurse, she noticed a " change " in the patient at about ten-thirty P. M. on the evening of April sixth and notified the house physician. Although a studious effort was apparent on the part of all the witnesses to minimize the seriousness of this " change," an entry on the chart which in this respect at least appears not to have been altered subsequent to the event, reads: " Pulse — weak — Thready — irreg." In any event, either then or an hour later, the house physician, according to the testimony, notified the superintendent that the patient was

"not doing so well" and she telephoned the petitioner who had requested that he be notified "if the patient grew worse." He arrived a short time thereafter, bringing the will with him.

The three subscribing witnesses testified that the instrument was executed between midnight and twelve-thirty A. M. on the morning of April seventh. All, however, agreed that at the time of the execution a thunderstorm was in progress, and that there was thunder and lightning at the time. It was testified by Dr. Scarr, of the Weather Bureau, that on the night in question, thunder was first heard at Sandy Hook at one-ten A. M. and at Battery Place at one-twenty A. M., which demonstrates beyond a reasonable doubt that the time of execution of the will must have been approximately an hour nearer the moment of death than the witnesses placed it and casts further doubt upon the accuracy of their testimony, particularly in view of the changes apparent on the charts.

Even if the testimony of the nurse is to be believed that she made an error in the place of entry on that chart that the dysphonic breathing (gasping for breath) did not begin at twelve-forty-five A. M., as indicated thereon, her testimony that after one A. M. there was marked change for the worse, stands, and, coupled with the meteorological demonstration above noted, indicates that the alleged execution of the will occurred at a time when the decedent was barely alive. The chart entry of the house physician in respect to the time the patient became comatose further appears to support this conclusion. While the time of the occurrence of this condition on the chart as submitted in evidence indicates it to have been at two-thirty A. M., the photographic enlargement of the hour shows clearly that the "two" in the "two-thirty" had originally been entered as a "one," with the result that the execution of the will must have occurred almost, if not quite, at a time when the decedent had lapsed into a comatose state.

The subscribing witnesses testified that the will was read to the testator by the proponent in English and then explained in Yiddish, paragraph by paragraph, after which the proponent stepped out of the room into the corridor, whereupon the instrument was signed by the testator "assisted" by the assistant superintendent of the hospital; that it was then signed by the assistant superintendent, the house physician and the night nurse as subscribing witnesses, the assistant superintendent conducting the ceremony. Thereupon the proponent re-entered the room and took possession of the instrument. Later, the bookkeeper of the hospital, who was a notary, signed the will at the request of the assistant superintendent, although he had not been present at its execution.

The handwriting expert called by contestants testified that the

signature to the will was " guided " and not an actual forgery. A comparison thereof with admitted signatures of the decedent and with writings of one of the subscribing witnesses made on the witness stand, demonstrates a marked absence of outstanding characteristics of decedent's manner of writing, and striking similarities to those of the witness. This is particularly obvious in the capital " M " of the signature and in the final " y." Testator obviously habitually made the former letter with the tops of the strokes pointed. The signature to the will and the manner of writing of the witness looped them; furthermore, the magnification of the signature on the will shows evident attempts at erasure in the first stroke in an effort to make it conform more closely to testator's usual manner of writing. The manner in which testator's final " y " was usually made shows no loop to the left. Such a loop is present in the signature to the propounded instrument and is markedly present in the specimen writings of the witness, made upon the stand.

It is an interesting subject of speculation as to when a " guided " signature becomes a forgery. Obviously, when any person writes, some instrument must be employed for the purpose, which in the usual case is a pen in a penholder. It would, of course, be possible to fasten a stick to the penholder and to exert the propulsive energy merely on this addition. The resulting writing would, however, be that of the person who moved the entire combined instrument. In like manner it might be possible for a person to fasten the pen into an inert human hand and to propel it in a manner which would make marks. In such a case the writing would no more be that of the possessor of the inert hand than it would be that of the stick in the case first supposed, and in both cases the characteristics displayed in the writing would be those of the active individual. So striking is the demonstration in the comparison of writing in the case at bar that the court is of the opinion that this is substantially what took place in the present instance.

The subscribing witnesses testified that in their opinion testator had testamentary capacity at the time of the execution of the instrument, but their testimony is greatly weakened by their obvious bias, by their utter lack of frankness, by their actions, and by their evasions and distortions of fact. The alterations upon the charts as to hours and concerning the patient's condition are most unsatisfactorily explained, and as to the house physician, one change made by him was denied until he was confronted with irrefutable proof, when it was reluctantly admitted. His testimony was patently untruthful and unreliable. The other two subscribing witnesses suppressed the fact that the pen fell out of the testator's

hand on the first occasion that it was given to him. The house physician disclosed this when pressed upon another matter on cross-examination. They refused to admit even that the patient was in a serious condition, although their acts indicated their conviction to the contrary, and also indicated that they knew, as was apparent from the patient's temperature, pulse, respiration and other pertinent facts respecting his condition and previous history, that he was a dying man.

As a result of the appearance and demeanor of the subscribing witnesses upon the stand, there is no escape from the conviction that they have deliberately, intentionally and probably concertedly, endeavored to minimize everything pointing to the seriousness of the patient's illness and magnified every contrary circumstances to the point of distortion. They have colored their testimony until it is substantially unbelievable.

The conduct of all concerned in the execution of the will, if it was done as testified to, was carefully conceived and expertly carried out, undoubtedly in anticipation of a contest, but all the facts disclosed by their testimony indicated their knowledge that the condition of the testator was so grave that every precaution was necessary to enable them subsequently to state that the testator was actually alive at the moment of execution.

Two eminent physicians testified that from the facts shown on the charts as to the condition of the patient, he could not have had testamentary capacity even at the time the will was said to have been executed, and another eminent physician testified that nobody could tell. When asked a hypothetical question, including the opinions of the subscribing witnesses, this expert, who was called by the proponent, said the patient had testamentary capacity, but when reasked the question omitting the opinions, he stated that he could not say either that the patient did or did not have testamentary capacity. The attending physician did not see patient after four P. M. on April sixth.

On a careful consideration of all the facts and circumstances in the case, the conclusion is inescapable that proponent has failed to sustain, by a fair preponderance of the credible evidence, that testator had testamentary capacity at the time he executed the will or that he knew or was capable of appreciating its contents, the burden of proof resting upon him of establishing it. The weight of the credible evidence is to the contrary.

The motion of proponent, made at the end of the case, to dismiss the objection is denied.

The motion of contestants to deny probate of the will is granted.

Proceed accordingly.