Otto C. Jaeger, S.
During the course of investigation by the Public Administrator and his attorneys to determine whether or not an alleged claimant is a distributee of decedent, a renewed Search of all decedent’s contacts and papers was undertaken in conjunction with an open commission to take the testimony of witnesses in Germany to prove pedigree status of the claimant. The inquiry was made of all decedent’s known contacts. in Europe. As a result, additional facts were learned and new papers discovered which brought on the present petition by the Public Administrator to probate two instruments, each entitled “My Last Will — Copy—Christmas 1965”, and each alleged to be entirely in the handwriting of decedent, signed by him and “ executed in accordance with the local law of Belgium, the, jurisdiction in which the will was executed at the time of execution.” Objections to admission of the instrument were filed by the claimant and the guardian ad litem for unknowns, raising issues as to due execution, testamentary capacity, testamentary intent and revocation. A considered evaluation of decedent’s known movements, contacts, life style and other factors is required for a proper determination of the issues.
Edgar Pehn, the decedent, was born in Riga, Latvia, on October 17, 1890. As a young man he was uprooted from his home in Riga at the Russian annexation, moved to Germany and finally came to the United States in the early ’30s, completed his education and began a teaching career in mathematics at Columbia University. He lived in Yonkers, New York, and if wealth is the yardstick of success, had a very successful career in the stock market. Nevertheless, one would not infer affluence from Ms manner of dress or mode of living. In Ms later years,, *87 after retiring, he spent long periods of time in Europe, maintained small flats in Kent, England, and Brussels, Belgium, and also sojourned in various places in Switzerland. He died in Liestal, Switzerland on January 17, 1968.
There are six purported testamentary instruments which have been introduced into evidence. Three are dated 22 May 1965 and three, hereinafter, for convenience, referred to as Christmas wills, are dated Christmas, 1965. Two of the Christmas wills are offered for probate. The other Christmas will is a photocopy of an instrument entitled “ copy ” but the copy was neither produced nor was its nonproduction explained. It is conceded that all of the purported wills (including the instrument from which the photocopy was made) are entirely in the handwriting of the decedent and signed by him. Consideration must now be given to each of the instruments and the persons receiving them.
- The instrument entitled “My Last Will — Copy—22 May 1965 ” was previously filed in this court by the Public Administrator with his petition dated September 25, 1969 seeking its denial of probate and requesting letters of administration. This instrument was found among the personal effects of decedent in his flat in Kent, England. By decree dated November 5,1969 probate was denied because the instrument was an unwitnessed holograph with no indication of validity under EPTL 3-2.2.
The next instrument entitled “My Last Will — Copy—22 May 1965 ” was first obtained when Dr. Carl Cramer appeared as a witness at the commission hearing held in Stuttgart, Germany, on July 12,1972. Dr. Cramer, as Deputy General Secretary of the League of Exiles, was recommended to decedent because of their common interest in persons exiled and they met for the first and only time on December 1, 1965. They conversed for about 2% hours and, among other things, spoke about a foundation decedent wished to establish in the near future. In the meantime Cramer was “ to think about his (Dehn’s) Last Will, which he wanted to send me, in order to be able to help him later.” Dehn mailed the “will” on December 14,. 1965 from Brussels. Other than a few more letters, there was no further contact between Cramer and Dehn after February 14,1966.
The third instrument entitled “My Last Will — Copy—.22 May 1965 ” was sent to one Hans Hertel in Bremen, Germany, on April 18,1966. It was stipulated that Hans Hertel never met decedent and never had any oral communications with him. Why Hertel received the “will” or the basis of association with decedent is not further explained.
*88 Each of the 1 ‘ wills ’ ’ dated 22 May 1965 was the same except for an occasional slight change in a phrase or word and except that the first two contained 7 footnotes while the third had 8. The third was mailed to Hans Hertel after the date of the Christmas 1965 “ will
One of the instruments presently offered for probate which is entitled “My Last Will — Copy — Christmas 1965 ” was found in the possession of Professor Erich von Sievers of the University of Stuttgart, Germany. He was the Leader of the German Baltic Fellowmen’s Association the purpose of which was to help countrymen and give them support while in Germany. It was because of this organization that decedent communicated with him sometime in 1965. A letter dated February 7, 1966 enclosing this instrument was sent by Dehn to the professor. In acknowledging receipt, the professor wrote Dehn at his Brussels residence acknowledging with satisfaction the intentions expressed by Dehn in the instrument and recommended two members- of the inner directorate of the Federal Fellow-Countrymen’s Association, one of whom was an attorney, for advice and co-operation to carry out Dehn’s plan. The professor again met Dehn in November 1966 and discussed the foundation proposed by Dehn to “help people who are refugees and who are in a difficult situation * * * and * * * oppose the decline of culture.”
The -third and last time Professor von Sievers saw and spoke to Dehn was around January 9,1968. The foundation was again discussed. Nothing further towards its establishment had been advanced since the last meeting. A week after this meeting, Dehn died in Liestal, Switzerland, but the professor was unaware of his death until he was called as a witness in this proceeding in July, 1972. He then produced the instrument which Dehn had mailed to him on February 7,1966.
The second instrument offered for probate which is also entitled “ My Last Will — Copy— Christmas ,1965 ” has been transmitted to one, Werner Jackh also of Stuttgart, by letter from the decedent dated November 15, 1966. Jackh testified that he was in the publishing business and first met Dehn early in 1966 when Dehn came to his office to discuss publication of some manuscripts and spoke also of his life; that a second meeting took place in May, 1966 in which Dehn .sought advice concerning his testamentary plans; that Dehn said the publication of his books would have to be related with a planned foundation and for this purpose he wanted to send Jackh his will; and that they also discussed how; a foundation could be *89 established in Germany. After Jackh’s receipt of the letter of November 15, 1966, there was correspondence between Jackh and Dehn. The next meeting between them was in the summer of 1967 and the foundation was further discussed. Jackh wrote Dehn on October 20,1967 that he was pursuing the plans they discussed for the foundation and had an attorney friend who could make the contract for a valid foundation. It, therefore, came as a surprise to Jackh when he was called by the American Embassy on January 18,1968 about the funeral plans of decedent. Jackh went to Liestal, Switzerland, helped prepare funeral arrangements and informed the Swiss authorities of decedent’s projected foundation. A copy of the instrument Jackh received from Dehn was given to the American Consul and the Community of Liestal, but nothing further was done or pursued with respect thereto. The instrument sent by Dehn to Jackh remained in Jackh’s possession until June, 1972, when petitioner contacted Jackh to be a witness in the proceeding and received the instrument.
Mrs. Jackh testified about meeting decedent in the summer of 1967 and related a conversation with him while decedent was waiting for her husband to come home. In answer to a question by petitioner’s counsel, Mrs. Jackh said:
“A: It started out as a private conversation, each of us told the other about each own’s life, and after he had heard that I was a full orphan, he automatically came to the point to say that he wanted to help such persons like me by his Foundation.
“ Q: What else was said?
“A: He told me that he was traveling a lot, and then I said jokingly, as he had such a very old briefcase with him, whether he was always carrying his property or his Testament with him, and I asked him, whether he had his Last Will in America, England, Belgium or Germany or in his briefcase, and the answer he gave me on that I still recall literally, he said, ‘1 always have my Last Will at hand ’, and then, because I was guessing that he was carrying his Last Will in that briefcase, I said, and what if anybody robbed you, and the literal answer was, ‘ No person will ever find it ’. ”
The third instrument entitled “My Last Will — Copy— Christmas 1965 ” is a photocopy delivered by decedent to Dr. Anthony E. Syz, an attorney in New York, during the course of their first meeting on March 13, 1967. Decedent came with a Mr. Bohnert, a member of the Swiss Consulate staff, to discuss creating a foundation to assist young people in receiving an education which foundation was to be established in Switzer *90 land and Tbe available to receive decedent’s estate. After .this first visit, decedent came to see Dr. Syz. again on March Í4th and 22nd. . He was alone on the last two visits, and it was agreed that Dr. Syz would prepare a will, which would effectuate decedent’s intent by use of a testamentary trust, and that an inter vivos foundation would be established in Basle, Switzerland, after which a codicil could be drawn which would leave the entire estate to this foundation. Dr. Syz also told decedent the name of a correspondent attorney in Basle to contact for this purpose. Another appointment was made between Dr. Syz and decedent to review a proposed draft of the will but was canceled when Dr. Syz received a cryptic message by. post card from Dehn stating “ I am aware of the risk I take, but having done it for years, a few more months may not matter much.”
Petitioner’s objections to the Syz testimony are overruled. The attorney-client privilege (CPLR 4503, subd. [a]) was waived initially by the presence of a third person (People v. Buchanan, 145 N. Y. 1; Baumann v. Steingester, 213 N. Y. 328; Matter of King, 89 Misc. 638). The fact that Bohnert was a diplomatic official is immaterial. Furthermore, CPLR 4503 (subd. [b]) expressly requires in an action involving the probate, validity or construction of a will, for an attorney ‘ ‘ to disclose information as to the preparation, execution or revocation of any will or other relevant instrument ”. In this probate proceeding, the testimony of Dr. Syz is particularly relevant with respect to decedent’s intent as to testamentary instruments. (See Matter of Stacer, 13 A D 2d 164, affd. 11 N Y 2d 780.)
With respect to the three instruments dated Christmas, 1965, it should be noted that except for a slight change in a word or spelling, the writings are the same and follow likewise the writ-. ings dated 22 May 1.965. However, there are only 7 footnotes to the first Christmas will and there are 9 footnotes to the second. The photocopy of the third has no footnotes although numbers 1 through 9 appear in the text, presumably for footnotes.
The first question to be determined is the formal validity of the will. EPTL 3-5.1 provides;
“(c) A will disposing of personal property, wherever situated, or real property situated in this state, made within or without this state by a domiciliary or non-domiciliary thereof, is formally valid and admissible to probate in this state, if it is in writing and signed by the testator, and otherwise executed ■ and attested in accordance with the local law of; * * * (2) The jurisdiction in which the will was executed, at the time of execution
*91 Upon the evidence (exclusive of the grocery slip of December 4, 1965 which was admitted over objection) the court is satisfied that decedent was in Brussels, Belgium, at Christmas, 1965. His presence there at or about that time is indicated not only by his letter of' December 14, 1965 to Dr. Cramer but also by the airmail letter dated December 23, 1965 addressed to W. E. Hutton & Co., 14 Wall St., New York, carrying a return address of 33 Bosnie St., Brussels 6, Belgium, and postmarked Brussels, December 26, 1965.
Having accepted Belgium as the jurisdiction in which decedent was present on Christmas, 1965, the local law of Belgium must be determined next. The two expert witnesses produced, one by petitioner and the other by objectant, were in basic agreement as to the requirements for the formal validity of a holographic will, viz. that it must be entirely in the handwriting of testator, signed by him and dated. Concededly, the instruments offered for probate are entirely in decedent’s handwriting and they are also signed by him. With respect to the question of dates, both experts also agreed that in the view of the foremost textbook writer on Belgian law (De Page) a religious holiday is a sufficient date. They agreed that Christmas, 1965, satisfied the requirements of date under Belgian law; also that where a testator knowingly inserted the wrong date in his will, the will is invalid since it does not comply-with the statute. Although proponent argues that presence of a date satisfies the formal validity requirement, it does not follow, especially in this case, that inquiry as to the accuracy of the date is barred. No testimony was offered with respect to the dates on the various instruments, either May or Christmas. It seems to the court improbable that the testator sat on a single day in May and again at Christmas and wrote, in a very small hand, a will containing some 40 closely written lines and additional material in footnotes and then rewrote each entire composition at least twice more with some variations, even though slight, in both the body and the footnotes, and then held these instruments for possible future use. However, validity of1 the propounded wills will not be determined herein on the issue of compliance with the law of Belgium as to dating.
Since the decedent left only personal property, the intrinsic validity of the instruments offered for probate is determined by the law of the jurisdiction in which decedent was domiciled (EPTL 3-5.1, subd. [b], par. [2]) which in this case is New York. Intrinsic validity necessarily includes appropriate testamentary intent in addition to testamentary capacity and free *92 dom from fraud and undue influence. The objections included lack of testamentary capacity, fraud and undue influence. No proof was offered with respect thereto and the objections as to fraud and undue influence were withdrawn. The court dismisses the objection as to testamentary capacity.
This leaves the issue of testamentary intent and, in the view of this court, this issue is the crux of the case. Did the decedent at the time he wrote these instruments intend the two offered for probate or either of them to be his last will? From the decedent’s actions, correspondence and conversations concerning the six instruments which, after his death, were found to be floating about Europe and the U. S. A., it is the conclusion of this court that the decedent did not so intend. This conclusion is supported by a consideration of the parties among whom the instruments were spread. Decedent saw Dr. Cramer óf Bonn, Germany, only once and sent him the instrument Hated 22 May 1965. Decedent sent an instrument to Hans Her-tel, of Bremen, Germany, a stranger, whom he never even saw. Decedent never knew Professor von Sievers, of Stuttgart, Germany, until sometime in 1965. Although decedent sent him one of the instruments now being offered for probate on February 7, 1966, they saw each other only three times, the last in 1968. Decedent did not know Mr. Jackh of Stuttgart, until 1966 when they met on publishing business. It was after the second visit when they discussed the proposed foundation that decedent sent the other instrument now offered for probate. And the last time they met was in 1967. In his communications with these men, the main subject was the establishment of the foundation. Decedent sought the advice of each man on this subject and for that purpose he provided each with a “copy” or, in the view of this court, a contemplated testament. To attribute a different purpose to the decedent and to argue that his testamentary plans had been finalized, would ignore the realities of this case. None of these persons was ever told by the decedent what to do with his “ copy” should •the decedent die. Which one of these persons, if any, did the decedent expect to come forward on decedent’s death and probate the “copy” he had? Not one took any action after the death of the decedent consistent with the premise that he possessed decedent’s last will. Bather the action or failure to act of each tends to confirm that each surmised that he possessed merely a draft. Indeed, to one, namely Dr. Syz, the decedent 'in effect admitted he had no will and expressed a willingness. to continue the status quo when he declared on the post card; *93 .“I am aware of the risk I take but having done it for years, a few more months may not matter much.” A similar admission may be deduced from his conversation with Mrs. Jackh. He told her “ I always have my Last Will at Hand ” and further “ No person will ever find it ”. These two statements would seem to be inconsistent, if not contradictory, unless he meant “ His Last Will ” was in his mind only, in which case, of course, no person would ever find it. This would be consistent with the inference which the court has drawn from decedent’s post card message to Dr. Syz, namely, that decedent had no will.
Proponent has strenuously tried to overcome the word “ copy ” appearing at the top of the various instruments. Proponent’s expert testified that under Belgian law the use of the word “copy” does not preclude the propounded instruments from being probated as originals since every holograph is in and of itself an original. From reading the cases dealing with the word “copy” appearing on wills, it is the view of this court that the true meaning of “ copy ” can be determined only from examining the circumstances in each particular case. A study or discussion of the word “copy” in the abstract or as defined in a dictionary is of little value when attempting to ascertain its meaning as used by a testator.
Proponent relies chiefly on the Belgian case of Marescal et al. v. Church of St. Michael and St. Gadula (Pasicrisie 1872, II pp. 287 et seq.). There a holographic will contained the phrase “ Copy of my Testament ”. The Court of Appeals of Brussels upheld the validity of the instrument as a will. Since California is a civil law State like Belgium, proponent also cites Estate of Schultz (54 Cal. 2d 513) involving a testament consisting of two handwritten letters which when taken together were admitted as the decedent’s last will. The first letter was headed “ Copy. Last Will and Testament.” The second letter had no heading. A second California case (Estate of Janes, 18 Cal. 2d 512) is also relied upon by proponent. There the Califor-. nia court sustained the validity of a holographic instrument to which a note was attached stating “ This is a copy of my last Will, the original is in my safe deposit box.” No original was ever found and the court indicated that there was no proof that one ever existed. While these cases may, perhaps, be cited for the proposition that a holographic instrument may be admitted to probate despite its being labelled “copy”, it does not follow that that ruling must be made in every case where the word “copy” is used. Testamentary intent must still be ascertained.
*94 In the Marescal and California cases, the instruments with the word “copy” were the only known purported testaments of decedent and in each case were found among his possessions. In each case, after inquiry into the testamentary intent of decedent with respect to. the instruments, the court found that each instrument was intended as an original and entitled to be admitted to probate. The facts, of course, were quite different from those here — none of those cases had six instruments or “copies ” involved; none had six instruments found in six different places at death and in the hands of different persons; none had any resemblance to the background facts in this case; and none had a declaration in writing made by the decedent (like the post card in this case) indicating that he had yet to finalize his plans and make a valid will.
In contrast to the holdings of1 these cases, another California case (Estate of Harris, 3 Cal. App. 2d 606) should he taken into account. This case involved two holographic instruments each dated the same date which were offered for probate. Both instruments contained the word “ copy ” and made inconsistent " gifts but were otherwise formally valid in form and the question raised was whether they were executed with testamentary intent. The verdict of the jury was that they were not. Tie appellate court stated that in order for a document to be the last will and testament of a deceased person, it must, in addition to meeting all other legal requirements, clearly show that the decedent intended it to take effect as a will upon his death. The question as to intent of the decedent with respect to the instruments was one of fact. While the California court in the Janes case (supra) limited the Harris case to its facts, the principle in Harris that there must be testamentary intent to make a valid will has not been qhanged.
Upon the facts of the present case, the court determines that the decedent did not have the requisite testamentary intent with respect to the propounded instruments and, therefore, that probate of these instruments must be denied.
In view of this determination it is unnecessary to consider the question of revocation.